J-A18003-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF A.R.L. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: G.K.L.S., MOTHER | : | No. 673 EDA 2018 |

Appeal from the Decree January 19, 2018
In the Court of Common Pleas of Montgomery County
Orphans' Court at No: 2017-A-0168

| | | |
|---|---|---|
| IN RE: ADOPTION OF A.J.L. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: G.K.L.S., MOTHER | : | No. 674 EDA 2018 |

Appeal from the Decree January 19, 2018
In the Court of Common Pleas of Montgomery County
Orphans' Court at No: 2017-A-0169

BEFORE:   STABILE, J., STEVENS*, P.J.E., and STRASSBURGER**, J.

MEMORANDUM BY STABILE, J.:                **FILED NOVEMBER 13, 2018**

G.K.L.S. ("Mother") appeals from the decrees entered on January 19,

2018, which terminated involuntarily her parental rights to her daughters,

_____

* Former Justice specially assigned to the Superior Court.

** Retired Senior Judge assigned to the Superior Court.

A.R.L., born in June 2001, and A.J.L., born in January 2007 (collectively, "the Children").[1]  After careful review, we affirm.

Mother and the Children have had a lengthy history of involvement with the Montgomery County Office of Children and Youth ("OCY") dating back to 2010.  Most recently, the Children came to the attention of OCY as the result of two incidents that took place in January 2016.  In the first incident, OCY received a referral indicating that A.J.L. was truant from school.  OCY began an investigation and discovered that Mother was not sending A.J.L. to school because there was no school bus available where they lived.  OCY scheduled a hearing before the juvenile court for January 19, 2016.  However, Mother failed to appear at the hearing.  In the second incident, which occurred that same day, OCY learned that A.R.L. fled Mother's home due to alleged physical abuse.  OCY obtained emergency protective custody of the Children, and the court adjudicated them dependent on January 26, 2016.

On September 20, 2017, OCY filed petitions to terminate Mother's parental rights to the Children involuntarily.  The orphans' court conducted a hearing on December 20, 2017, and December 21, 2017.[2]  It entered decrees

---

[1] The orphans' court entered separate decrees on the same date terminating involuntarily the parental rights of L.E.B., Jr. ("Father").  Father appealed the termination of his parental rights at Superior Court docket numbers 671 and 672 EDA 2018.  We address his appeal in a separate memorandum.

[2] Jennifer Diveterano Gayle, Esquire, served as the Children's counsel and guardian *ad litem* during the hearing.  Attorney Diveterano stated that she spoke to the Children and that they did not wish to oppose the termination

terminating Mother's rights on January 19, 2018. Mother timely filed a notice

of appeal on February 20, 2018,[3] along with a concise statement of errors

complained of on appeal.[4]

Mother now raises the following claims for our review.

1. Did the honorable [orphans'] court err in terminating [Mother's] parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2) where the mother (i) obtained suitable housing, (ii) obtained stable employment, (iii) obtained mental heath treatment, (iv) made reasonable efforts to comply with the family service plan

_____

proceedings. N.T., 12/21/17, at 381-82. She filed a brief arguing in support of termination in this Court.

[3] Generally, a party must file his or her notice of appeal within thirty days after entry of the decree. **See** Pa.R.A.P. 903(a) ("Except as otherwise prescribed by this rule, the notice of appeal ... shall be filed within 30 days after the entry of the order from which the appeal is taken."). Thirty days after January 19, 2018, was Sunday, February 18, 2018. In addition, the courts were closed on Monday, February 19, 2018, for Presidents' Day. As a result, Mother timely filed her notice of appeal on Tuesday, February 20, 2018. **See** 1 Pa.C.S.A. § 1908 ("Whenever the last day of any such period shall fall on Saturday or Sunday, or on any day made a legal holiday by the laws of this Commonwealth or of the United States, such day shall be omitted from the computation.").

[4] It appears that Mother filed only a single notice of appeal from the decrees terminating her parental rights, which was copied and included in the record twice. The correct procedure in this circumstance is to file a separate notice of appeal for each child. **See** Pa.R.A.P. 341, Note ("Where … one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed."). In a recent case, our Supreme Court held that the failure to file separate notices of appeal from an order resolving issues on more than one docket "requires the appellate court to quash the appeal." **Commonwealth v. Walker**, 185 A.3d 969, 977 (Pa. 2018). However, the Court clarified that it would apply its holding only "in future cases," because of decades of prior case law that seldom quashed appeals for that reason, and because the citation to case law contained in the note to Rule 341 was unclear. **Id.** Thus, because Mother filed her notice of appeal prior to the filing of our Supreme Court's decision in **Walker**, we do not quash her appeal.

[("FSP")], (v) addressed the concerns of [OCY], (vi) maintained a positive presence in the lives of the Children, and (vii) the record is devoid of any evidence that [Mother's] repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the Children to be without essential parental care, control, or subsistence necessary for the Children's physical or mental well-being or that such conditions will not be remedied by [Mother]? The evidence at trial failed to establish by clear and convincing evidence that any incapacity on the part of Mother could not or would not be[]remedied by her; evidence at trial further failed to establish repeated and continued abuse or neglect on the part of Mother necessitating termination of her parental rights.

2. Did the honorable [orphans'] court err in terminating [Mother's] parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8) where the mother (i) obtained suitable housing, (ii) obtained stable employment, (iii) obtained mental health treatment, (iv) made reasonable efforts to comply with the [FSP], (v) addressed the concerns of [OCY] and (vi) maintained a positive presence in the lives of the Children? The evidence at trial failed[]to establish by clear and convincing evidence that the conditions which led to the removal of the Children continued to exist and that termination of parental rights would serve the best interests of the Children.

3. Did the honorable [orphans'] court commit error by involuntarily terminating Mother's parental rights to the Children where the evidence confirmed that a strong and loving bond existed between Mother and the Children and that [OCY] was unable to establish by clear and convincing evidence that termination was in the best interests of the Children as contemplated in 23 Pa.C.S.A. § 2511(b)? The evidence at trial failed to establish clear and convincing evidence that termination was in the best interests of the Children.

Mother's Brief at 4 (unnecessary capitalization omitted).

We consider these claims mindful of our well-settled standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse

of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S.A. § 2511. It requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Mother's parental rights to the Children involuntarily pursuant to Section 2511(a)(2), (8), and (b). We need only agree with the court as to any one subsection of Section 2511(a) as well as Section 2511(b) in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision pursuant to Section 2511(a)(2) and (b), which provides as follows.

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*\*\*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We address first whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

In the instant matter, the orphans' court found that Mother lacked the capacity to parent the Children and that she could not or would not remedy her parental incapacity. Orphans' Court Opinion, 1/18/18, at 11-12. The court reasoned that Mother failed to address her history of substance abuse and displayed little insight into her responsibility for the Children's placement in foster care. *Id.* at 5-7, 11. It observed that Mother discussed inappropriate topics with the Children, which resulted in her being unable to send letters or call them on the phone. *Id.* at 7-8, 11. She also obtained new housing more than an hour and a half away from the Children, which limited her ability to attend visits due to a lack of transportation. *Id.* at 8-9, 11.

Mother contends that she alleviated the circumstances leading to the Children's placement and achieved substantial compliance with her FSP goals. Mother's Brief at 7, 9-11. She argues that she visited the Children, obtained housing and employment, completed parenting classes, and attended both mental health and substance abuse treatment. *Id.* She also notes that she completed anger management classes, although this was not a requirement of the FSP. *Id.* at 11-12.

After a thorough review of the record in this matter, we discern no abuse of discretion by the orphans' court. The Children's OCY caseworker, Amber McCarthy, testified that Mother's FSP goals included cooperating with OCY, obtaining stable housing, obtaining stable income, attending mental health treatment, attending drug and alcohol treatment, and visiting the Children. N.T., 12/20/17, at 198. Mother's goals also included completing a parenting class. *Id.* at 250.

Concerning Mother's compliance with these goals, Ms. McCarthy testified that she failed to cooperate with OCY. *Id.* at 210. OCY referred Mother for services through Time-Limited Family Reunification. *Id.* at 199. Mother did not engage with the program, resulting in an unsuccessful termination. *Id.* Moreover, Ms. McCarthy explained that Mother "has been very hostile. She belittles me. She belittles me in front of the [C]hildren. She also takes no responsibility in front of the [C]hildren. We go over goals. When we discuss the [FSP], she always says everything is accomplished. She tells the girls everything is accomplished." *Id.* at 210-11.

With respect to Mother's mental health goal, Ms. McCarthy testified that she attends counseling to address her behavioral health needs. *Id.* at 255. Ms. McCarthy further discussed Mother's drug and alcohol goal, explaining that she has a history of using marijuana and pills. *Id.* at 202. Mother commenced a substance abuse treatment program but failed to participate consistently. *Id.* at 202-03. The program asked Mother to leave "due to her out of control

behaviors."[5]  *Id.* at 203.  In addition, Ms. McCarthy recounted that Mother was arrested in June 2017 and incarcerated for several months "[d]ue to an outstanding warrant that she had.  She had a warrant out for her arrest for a year.  And that was in regards to selling marijuana brownies."[6]  *Id.* at 207, 209.

While Mother complied with her stable employment goal, Ms. McCarthy cautioned that she continues to display financial instability.  *Id.* at 201, 254-55.  Mother has "talked about having a friend pay for her cell phone.  She's spoken about having to steal toilet paper from her job due to her not having the funds."  *Id.* at 201, 215.  Mother also complied with her stable housing goal, but moved from Montgomery County to Pottsville, Schuylkill County in September 2016 in order to do so.  *Id.* at 200, 250-51.  Mother began taking a bus to Montgomery County to attend visits.  *Id.* at 202.  However, the bus route was discontinued in October 2016 and she did not attend any visits with

_____

[5] Alicia Fleischut, the executive director and clinical supervisor of Clinical Outcomes Group, where Mother attends substance abuse treatment, testified that the program discharged her in March 2017, but accepted her back in August 2017.  N.T., 12/20/17, at 31.  Ms. Fleischut testified that Mother has missed numerous appointments since returning to the program and "at this point, she's probably running on being discharged again due to just not showing up."  *Id.*

[6] Reportedly, Mother's home smelled like marijuana at the time of her arrest. N.T., 12/20/17, at 208.  Mother claimed to Ms. McCarthy "that someone else" was smoking marijuana in her home but "she didn't know it."  *Id.*  Mother testified that she was an everyday user of marijuana until May 2016 but that she may have tested positive for marijuana as recently as June 2016 because it stayed in her system.  N.T., 12/21/17, at 349, 354.

the Children from November 3, 2016 until OCY began providing transportation on March 2, 2017. *Id.* at 202, 216-18. OCY offers Mother supervised visits with the Children every other week. *Id.* at 201, 218. OCY transports Mother once per month, but places the responsibility on her to find transportation for any remaining visits. *Id.* at 201-02. Mother never attended a visit following November 2016 without OCY's assistance. *Id.* at 268.

Importantly, while Mother protested that she was unable to attend visits more frequently due to her lack of transportation, Ms. McCarthy questioned the accuracy of Mother's claims. *Id.* at 215. She explained,

> I do feel there are other options that she has not taken advantage of. She has been able to get to OCY court. She was involved with probation here in Montgomery County. She was able to get to those hearings. She was able to go to New York City on a trip. And frequently at all visits she always talks about people in her life, friends, supports.

*Id.* at 215-16. Ms. McCarthy offered to schedule visits for times when Mother is traveling to Montgomery County for her other hearings, but Mother did not take advantage of that offer. *Id.* at 267.

During the visits that Mother did attend, Ms. McCarthy testified that she exhibited inappropriate behavior. Mother would insist that the Children should return to her care and become agitated and hostile at Ms. McCarthy's attempts to redirect her. *Id.* at 218-19, 221. Ms. McCarthy noted that Mother struggled to parent the Children and that the visits lacked substance. *Id.* at 219, 221. Mother asked the Children "cookie-cutter questions" and they responded the same way "over and over again." *Id.* at 219. While Mother did complete a

parenting class, Ms. McCarthy did not notice any improvement in her parenting skills. *Id.* at 222, 250.

In addition to visits, Ms. McCarthy testified that OCY allowed Mother to call the Children on the phone. However, OCY stopped the calls in October 2016 due once again to Mother's inappropriate behavior.[7] *Id.* at 212, 255-57. During calls, Mother would sometimes "pass the phone to somebody else to talk to the girls[.]" *Id.* On other occasions, Mother would "make promises. She would tell the girls you're going to get this type of bedding when you're going to get home. I'm going to get you this when you come home." *Id.* Ms. McCarthy had to ask Mother repeatedly to refrain from making these types of statements. *Id.* at 212-14, 268. After the phone calls ended, Ms. McCarthy suggested that Mother write letters to the Children. *Id.* at 214. Mother's letters "got to be too much . . . . It was just -- it was too long of a letter. It was very overwhelming of -- kind of how [Mother] felt about things," so Ms. McCarthy asked her to send cards to the Children instead. *Id.* at 214, 258. Mother rarely did so. *Id.* at 214. Typically, Mother would send cards to the Children for the holidays. *Id.* at 215. When Ms. McCarthy suggested that the Children would appreciate receiving cards more frequently, Mother stated that she "doesn't have time." *Id.*

Thus, the record supports the finding of the orphans' court that Mother is incapable of parenting the Children and that she cannot or will not remedy

---

[7] Initially, Ms. McCarthy testified that OCY stopped Mother's phone calls with the Children in September 2016. N.T., 12/20/17, at 214.

her parental incapacity. At the time of the termination hearing in this matter, the Children had been in foster care for nearly two years. Mother continued to be uncooperative and hostile toward OCY, and she had not addressed her substance abuse history consistently. Despite obtaining employment, she continued to be unstable financially. While she also obtained housing, her housing was located outside of Montgomery County, which made it difficult for her to attend visits with the Children. Tellingly, Mother managed to obtain transportation to OCY hearings, probation hearings, and even New York City, but did not make obtaining transportation to visits a priority. Even during the visits that Mother did attend, and during her phone calls to the Children, she continued to make inappropriate statements and exhibited hostility toward OCY in front of the Children. Given Mother's failure to comply with her FSP goals for such a lengthy period of time, it is clear that she will not demonstrate the maturity and stability necessary to parent the Children at any point in the foreseeable future. Thus, we discern no abuse of discretion by the court in terminating her parental rights. As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

We next consider whether the orphans' court abused its discretion by involuntarily terminating Mother's parental rights to the Children pursuant to Section 2511(b). The requisite analysis is as follows:

Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the [S]ection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted).

The orphans' court concluded that terminating Mother's parental rights would best serve the Children's needs and welfare. Orphans' Court Opinion, 1/18/18, at 13. The court reasoned that Mother failed to maintain a healthy parental bond with the Children and that terminating her parental rights would not cause them to suffer a detriment. *Id.* It found that Mother failed to attend

- 13 -

numerous visits with the Children and interacted inappropriately during the visits that she did attend. *Id.* Further, it found that the Children reside in a pre-adoptive foster home and refer to their foster mother as "Mom." *Id.*

Mother argues that the orphans' court failed to consider the Children's physical and emotional needs. Mother's Brief at 13. She contends that she possesses a strong and loving bond with the Children and challenges the court's finding that termination of her parental rights would not be detrimental to them. *Id.* at 7, 13. She notes that she learned how to correct the Children's behavioral issues without resorting to physical discipline. *Id.* at 7.

We again conclude that Mother is not entitled to relief. While it is clear that the Children have a relationship with Mother, the record supports the finding of the orphans' court that this relationship is not a healthy parental bond. As noted above, Mother did not visit with the Children from November 2016 until March 2017 and missed approximately half of her visits thereafter. She engaged in inappropriate behavior during the visits that she did attend, insisting that the Children should return to her care and becoming agitated and hostile. Ms. McCarthy described Mother's relationship with the Children as a "mother/friend relationship" rather than a parental bond. N.T., 12/20/17, at 229. She explained,

> They are very loyal to mom. I feel they try to be more of a parent sometimes. [A.J.L.] always sits next to [Mother], and she is always the one to tell mom, ["]Calm down, this is going to be okay,["] if [Mother] becomes upset. And that's been an ongoing pattern. . . .

\*\*\*

- 14 -

. . . . I feel the girls -- they worry about [Mother]. They want to be that protective person, and I feel sometimes they worry about her more than [Mother] does about them. They want her to be calm. They want her to be okay.

*Id.* at 219, 229. Ms. McCarthy did not believe that termination of Mother's parental rights would be detrimental to the Children due to her instability. *Id.* at 223.

The orphans' court also heard the testimony of psychologist, Stephen Miksic, Ph.D. Dr. Miksic conducted a psychological and parenting evaluation of Mother during which he observed her interactions with the Children. He opined that the Children's relationship with Mother is "highly insecure[.]" *Id.* at 79. He stated that the Children's "attachment is often based on [Mother's] influence of them to reject other individuals as interfering in their relationship, and the bond is unhealthy because of that circumstance. And even in the unhealthy nature of it, the bond is weak." *Id.* at 80.

Further, the record indicates that the Children are doing well in foster care. Ms. McCarthy testified that the Children have resided in a pre-adoptive foster home since August 2017. *Id.* at 223-24. She reported that they appear to be happy. *Id.* at 224. When she conducts visits at the home, the Children "seem comfortable. They seem to be laughing and having a good time and doing well." *Id.* at 224-25. Moreover, as mentioned above, the Children's counsel provided a statement at the conclusion of the hearing indicating that she met with both of the Children. N.T., 12/21/17, at 381-82. Counsel stated

that the Children "did not want to oppose the termination." ***Id.*** at 382. Thus, the record confirms that terminating Mother's parental rights would best serve the Children's needs and welfare.

Based on the foregoing, we conclude that the orphans' court did not abuse its discretion by terminating Mother's parental rights to the Children involuntarily. Therefore, we affirm the court's January 19, 2018 decrees.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/13/18